# EXHIBIT "A"

# FIXED/ADJUSTABLE RATE BALLOON NOTE
### (LIBOR Six-Month Index (As Published In *The Wall Street Journal*) - Rate Caps)



THIS LOAN IS PAYABLE IN FULL AT MATURITY. YOU MUST REPAY THE ENTIRE PRINCIPAL BALANCE OF THE LOAN AND UNPAID INTEREST THEN DUE. LENDER IS UNDER NO OBLIGATION TO REFINANCE THE LOAN AT THAT TIME. YOU WILL, THEREFORE, BE REQUIRED TO MAKE PAYMENT OUT OF OTHER ASSETS THAT YOU MAY OWN, OR YOU WILL HAVE TO FIND A LENDER, WHICH MAY BE THE LENDER YOU HAVE THIS LOAN WITH, WILLING TO LEND YOU THE MONEY. IF YOU REFINANCE THIS LOAN AT MATURITY, YOU WILL PROBABLY BE CHARGED INTEREST AT MARKET RATES PREVAILING AT THAT TIME AND SUCH RATES MAY BE HIGHER THAN THE INTEREST RATE PAID ON THIS LOAN. YOU MAY ALSO HAVE TO PAY SOME OR ALL OF THE CLOSING COSTS NORMALLY ASSOCIATED WITH A NEW MORTGAGE LOAN EVEN IF YOU OBTAIN REFINANCING FROM THE SAME LENDER.

THIS NOTE PROVIDES FOR A CHANGE IN YOUR INITIAL FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE. THIS NOTE LIMITS THE AMOUNT YOUR ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE YOU MUST PAY.

| February 13, 2007 | Danville | California |
|---|---|---|
| [Date] | [City] | [State] |

2531 Heide Court, El Sobrante, CA 94803

[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $  999,999.00                (this amount is called "Principal"), plus interest, to the order of Lender. Lender is Washington Mutual Bank

I will make all payments under this Note in the form of cash, check or money order. I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of                7.375 %. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payments on the first day of each month beginning on  April 1st              , 2007        . I will make these payments every month until I have paid all of the Principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. On March 1              , 2037        (which is called the "Maturity Date"), I will pay the Balloon Payment as provided in Section 4(C) of this Note. I understand and acknowledge that the Balloon Payment due on the Maturity Date will be much larger than a regular monthly payment and that the Note Holder has no obligation to refinance the Balloon Payment.

I will make my monthly payments at   Washington Mutual Bank,  P.O.Box 3139, Milwaukee, WI 53201-3139
or at a different place if required by the Note Holder.

### (B) Amount of My Initial Monthly Payments

Each of my initial monthly payments will be in the amount of U.S. $ 6,488.52                . This amount may change.

### (C) Monthly Payment Changes

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of   March              , 2009     , and the interest rate I will pay may change on that day every 6th            month thereafter. Each date on which my interest rate could change is called a "Change Date."

### (B) The Index

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the date 45 days before the Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new Index that is based upon comparable information. The Note Holder will give me notice of this choice.

MULTISTATE FIXED/ADJUSTABLE RATE BALLOON NOTE LIBOR

VMP Mortgage Solutions, Inc.

(C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding Four and 99/100 percentage point(s) ( 4.990 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date, together with interest at the new interest rate, in full in substantially equal installments through March 1, 2047 ("Amortization Date"). The result of this calculation will be the new amount of my monthly payment.

I understand that because my monthly payments will be calculated over a period of 40 years, but the actual term of my loan is only 30 years, my regular monthly payments will be insufficient to pay the entire principal balance of my loan and the interest I owe by the Maturity Date and I will be required to pay a single payment (a "Balloon Payment") on the Maturity Date that consists of a regular monthly payment together with the remaining unpaid principal balance of my loan, all accrued and unpaid interest, and all charges due under my Note.

(D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than 9.375 % or less than 7.375 %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than One percentage point(s)( 1.000 %) from the rate of interest I have been paying for the preceding 6 months. My interest rate will never be greater than 13.375 % or less than 7.375 %.

(E) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

(F) Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## 5. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A prepayment of all the unpaid principal is known as a ``FullPrepayment.'' A prepayment of only part of the unpaid principal is known as a ``PartialPrepayment.'' Except as provided below, I may make a Full or Partial Prepayment at any time.

If I make a Full or Partial Prepayment, I may be charged a fee as follows: If Note Holder receives a Prepayment of more than twenty percent (20.0%) of the original principal amount in any twelve (12) month period on or before the first anniversary of the date of the Note, the prepayment fee shall be equal to the payment of six months advance interest on the amount prepaid that exceeds 20 percent of the original principal amount, calculated at the interest rate in effect on the date(s) of such Full Prepayment or Partial Prepayment(s) (the ``Prepayment Fee'').

When I make a Full or Partial Prepayment, I will notify the Note Holder in writing that I am doing so. Any Partial Prepayment shall be applied to interest accrued on the amount prepaid, if any, then to the Prepayment Fee, if applicable, and then to the principal balance of the Note, which shall not reduce the amount of monthly installments of principal and interest nor relieve me of the obligation to make the installments each and every month until the Note is paid in full. Partial Prepayments shall have no effect upon the due dates or the amounts of my monthly payments unless the Note Holder agrees in writing to such changes.

## 6. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 7. BORROWER'S FAILURE TO PAY AS REQUIRED

(A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of Fifteen calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 6 % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

(B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

(C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**MULTISTATE FIXED/ADJUSTABLE RATE BALLOON NOTE LIBOR**

**(D) No Waiver by Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 8. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are:

(A) Until Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Covenant 18 of the Security Instrument provides as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

(B) When Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Covenant 18 of the Security Instrument shall then instead provide as follows:

MULTISTATE FIXED/ADJUSTABLE RATE BALLOON NOTE LIBOR

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
Kathryn Jean Nusratty                 -Borrower

_____ (Seal)
M. Hasan. Nusratty                    -Borrower

_____ (Seal)
                                      -Borrower

_____ (Seal)
                                      -Borrower

[Sign Original Only]

**MULTISTATE FIXED/ADJUSTABLE RATE BALLOON NOTE LIBOR**

Pay to the order of

Without Recourse
WASHINGTON MUTUAL BANK

Cynthia A. Riley, Vice President

Recording Requested By:
Washington Mutual Bank

Return To:
2210 Enterprise Drive
Doc Ops - MS SCO0140
Florence, SC 29501

**Placer Title**

Prepared By:
Melissa Castaneda

CONTRA COSTA Co Recorder Office
STEPHEN L. WEIR, Clerk-Recorder
**DOC- 2007-0052925-00**
Acct  12- Placer Title
Thursday, FEB 22, 2007 08:00:00
MIC    $1.00:MOD    $21.00:REC    $25.00
FTC    $20.00:DAF    $1.80:REF    $0.20
**Ttl Pd    $69.00**        Nbr

—————————————————[Space Above This Line For Recording Data]—————————————————

# DEED OF TRUST

DEFINITIONS
Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated February 13, 2007 ,
together with all Riders to this document.
(B) "Borrower" is Kathryn Jean Nusratty and M Hasan Nusratty, Wife And Husband As Joint Tenants

Borrower's address is 2531 Heide Court, El Sobrante, CA 94803
. Borrower is the trustor under this Security Instrument.
(C) "Lender" is Washington Mutual Bank

Lender is a federal association
organized and existing under the laws of the United States

CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT        Form 3005  1/01

VMP®-6(CA) (0207).01

Page 1 of 15        Initials:

VMP Mortgage Solutions, Inc.

Lender's address is 1400 South Douglass Road, Suite 100, Anaheim, CA 92806

Lender is the beneficiary under this Security Instrument.
(D) "Trustee" is California Reconveyance Company, a California corporation

(E) "Note" means the promissory note signed by Borrower and dated February 13, 2007
The Note states that Borrower owes Lender Nine Hundred Ninety Nine Thousand Nine
Hundred Ninety Nine and No/100                                                        Dollars
(U.S. $ 999,999.00          ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than March 1, 2037
(F) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."
(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider      ☐ Condominium Rider             ☐ Second Home Rider
☒ Balloon Rider              ☐ Planned Unit Development Rider ☐ 1-4 Family Rider
☐ VA Rider                   ☐ Biweekly Payment Rider        ☐ Other(s) [specify]

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.
(L) "Escrow Items" means those items that are described in Section 3.
(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.
(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on,
the Loan.
(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its
implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to
time, or any additional or successor legislation or regulation that governs the same subject matter. As used
in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard

Initials:

-6(CA) (0207).01                        Page 2 of 15                            Form 3005   1/01

to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q)** "**Successor in Interest of Borrower**" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the County                                    of CONTRA COSTA                                    :

      [Type of Recording Jurisdiction]                    [Name of Recording Jurisdiction]

Legal Description Attached Hereto And Made A Part Hereof

Parcel ID Number:                                      which currently has the address of
2531 Heide Court                                                              [Street]
El Sobrante                                  [City] , California  94803        [Zip Code]
("Property Address"):

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

    THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

    UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

    **1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S.

Initials: _____

currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be

 

in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly  payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

 

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

 

Initials:

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

 



attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**



Initials: 



(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender

Initials:

to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

Initials:

VMP-6(CA) (0207).01                    Page 10 of 15                    Form 3005   1/01

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA

 

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.



Initials:

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Reconveyance. Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

24. Substitute Trustee. Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

25. Statement of Obligation Fee. Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

 

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____          _____ (Seal)
                                          Kathryn Jean Nusratty                -Borrower


_____          _____ (Seal)
                                          M. Hasan. Nusratty                   -Borrower


_____ (Seal)   _____ (Seal)
                      -Borrower                                -Borrower


_____ (Seal)   _____ (Seal)
                      -Borrower                                -Borrower


_____ (Seal)   _____ (Seal)
                      -Borrower                                -Borrower


VMP®-6(CA) (0207).01                  Page 14 of 15                  Form 3005   1/01

State of California
County of *Contra Costa*                                          } ss.

On *2/15/07*                before me, *E. Bliss, Notary Public*

personally appeared

*Kathryn Jean Husratty & M. Hasan Husratty*

, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

*E. Bliss* _____ (Seal)



VMP®-6(CA) (0207).01                    Page 15 of 15                    Initials _____                    Form 3005   1/01

Order No. ▆▆▆▆▆
UPDATE

EXHIBIT "A"
LEGAL DESCRIPTION

THE LAND DESCRIBED HEREIN IS SITUATED IN THE STATE OF CALIFORNIA, COUNTY OF
CONTRA COSTA, UNINCORPORATED AREA, AND IS DESCRIBED AS FOLLOWS:

PARCEL ONE:

LOT 6, MAP OF SUBDIVISION 3355, FILED JULY 28, 1965, MAP BOOK 106, PAGE 12,
CONTRA COSTA COUNTY RECORDS.

EXCEPTING THEREFROM:

AN EASEMENT, NOT TO BE EXCLUSIVE, AS AN APPURTENANCE TO PARCEL ONE ABOVE  WHICH
WAS ORIGINALLY CREATED, FOR USE AS A ROADWAY FOR VEHICLES OF ALL KINDS,
PEDESTRIANS, AND ANIMALS AND  AS A RIGHT OF WAY FOR WATER, GAS, OIL, AND SEWER
PIPELINES AND FOR TELEPHONE, ELECTRIC LIGHT AND POWER LINES, TOGETHER WITH THE
NECESSARY POLES OR CONDUITS TO CARRY SAID LINES, OVER AND UNDER THE FOLLOWING
DESCRIBED PARCEL OF LAND:

BEGINNING ON THE EAST LINE OF LOT 5, DISTANT THEREON NORTH 11 DEGREES 41' 17"
WEST 134.49 FEET AND NORTH 1 DEGREE 56' 03" EAST 22.06 FEET FROM THE NORTH
LINE OF HEIDE COURT, AS SHOWN ON SAID MAP, (106 M 12); THENCE FROM SAID POINT
OF BEGINNING ALONG THE EXTERIOR LINE OF LOTS 5 AND 6 AS FOLLOWS:  SOUTH 1
DEGREES 56' 03" WEST 22.06 FEET; SOUTH 11 DEGREES 41' 17"  EAST 134.49 FEET;
WESTERLY ALONG THE ARC OF A CURVE TO THE LEFT HAVING A  RADIUS OF 45 FEET AN
ARC DISTANCE OF 20 FEET; AND NORTH 28 DEGREES 49' 43" WEST  135 FEET TO AN
ANGLE POINT IN SAID LOT 6; THENCE CONTINUING NORTH 28 DEGREES 49' 43" WEST
68.76 FEET TO A SOUTHWEST LINE OF SAID LOT 5; THENCE SOUTH 60 DEGREES  EAST
ALONG SAID SOUTHWEST LINE 62.94 FEET TO AN ANGLE POINT THEREIN;  THENCE NORTH
69 DEGREES 43' 05" EAST 38.34 FEET TO THE POINT OF BEGINNING.

PARCEL TWO:

RIGHT OF WAY GRANTED IN THE DEED TO MELVIN W. HOLDEN, ET UX,  RECORDED JUNE 3,
1970, BOOK 6141, OFFICIAL RECORDS, PAGE 760, AS  FOLLOWS:

"AN EASEMENT, NOT TO BE EXCLUSIVE, AS AN APPURTENANCE TO PARCEL ONE ABOVE, FOR
USE AS A ROADWAY FOR VEHICLES OF ALL KINDS, PEDESTRIANS,  AND ANIMALS AND AS A
RIGHT OF WAY FOR WATER, GAS, OIL, AND SEWER PIPELINES AND FOR TELEPHONE,
ELECTRIC LIGHT AND POWER LINES, TOGETHER WITH THE  NECESSARY POLES OR CONDUITS
TO CARRY SAID LINES, OVER AND UNDER THE  FOLLOWING DESCRIBE PARCEL OF
LAND:

BEGINNING ON THE EAST LINE OF LOT 5,  DISTANT THEREON NORTH 11 DEGREES 41' 17"
WEST 134.49 FEET AND NORTH 1 DEGREE 56' 03" EAST 22.06 FEET FROM THE NORTH
LINE OF HEIDI COURT, AS SHOWN ON SAID  MAP, (106 M 12); THENCE FROM SAID POINT
OF BEGINNING ALONG THE EXTERIOR  LINE OF LOTS 5 AND 6 AS FOLLOWS:  SOUTH 1
DEGREES 56' 03" WEST 22.06 FEET; SOUTH 11 DEGREES 41' 17" EAST 134.49 FEET;
WESTERLY ALONG THE ARC OF A CURVE TO THE  LEFT HAVING A RADIUS OF 45 FEET AN
ARC DISTANCE OF 20 FEET; AND NORTH 28  DEGREES 49' 43" WEST 135 FEET TO AN

PRE.LEGAL                       CLTA Preliminary Report

Order No. ███████
UPDATE

### EXHIBIT "A"
### LEGAL DESCRIPTION continued

ANGLE POINT IN SAID LOT 6; THENCE CONTINUING NORTH 28 DEGREES 49' 43" WEST 68.76 FEET TO A SOUTHWEST LINE OF SAID LOT 5;  THENCE SOUTH 60 DEGREES EAST ALONG SAID SOUTHWEST LINE 62.94 FEET TO AN ANGLE  POINT THEREIN; THENCE NORTH 69 DEGREES 43' 05 EAST 38.34 FEET TO THE POINT OF  BEGINNING."

A.P.N. ███████

LEGAL.0

CLTA Preliminary Report

# FIXED/ADJUSTABLE  RATE BALLOON RIDER

THIS FIXED/ADJUSTABLE RATE BALLOON RIDER is made on this 13th        day of February
, 2007      , and is incorporated into and shall be deemed to amend and supplement the
Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the
undersigned ("Borrower") to secure Borrower's Fixed/Adjustable Rate Balloon Note (the "Note") to
Washington Mutual Bank
("Lender") of the same date and covering the property described in the Security Instrument and located at:
2531 Heide Court, El Sobrante, CA 94803

[Property Address]

THIS LOAN IS PAYABLE IN FULL AT MATURITY.  BORROWER MUST
REPAY THE ENTIRE PRINCIPAL BALANCE OF THE LOAN AND UNPAID
INTEREST THEN DUE.  LENDER IS UNDER NO OBLIGATION TO REFINANCE
THE LOAN AT THAT TIME.

THE NOTE CONTAINS PROVISIONS ALLOWING FOR A CHANGE FROM THE
INITIAL FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE AND
FOR CHANGES IN THE MONTHLY PAYMENT.  THE NOTE LIMITS THE
AMOUNT BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME
AND THE MAXIMUM RATE BORROWER MUST PAY.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:
## A. INTEREST RATE AND MONTHLY PAYMENT CHANGES
The Note provides for an initial fixed interest rate of                          7.375 %.  The Note
provides for a change in the initial fixed interest rate to an adjustable interest rate and for changes in the
monthly payments, as follows:
## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES
(A) Change Dates
The initial fixed interest rate Borrower will pay will change to an adjustable interest rate on the first
day of  March, 2009                                , and the interest rate Borrower will pay may change
on that day every 6th           month thereafter.  Each date on which Borrower's interest rate could
change is called a "Change Date."

Multistate Fixed/Adjustable Rate Balloon Rider - Libor
VMP Mortgage Solutions, Inc.

**(B) The Index**

Beginning with the first Change Date, Borrower's interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in The Wall Street Journal. The most recent Index figure available as of the date 45 days before the Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give Borrower notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate Borrower's new interest rate by adding Four and 99/100                                     percentage points (        4.990 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be Borrower's new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that Borrower is expected to owe at the Change Date, together with interest at the new interest rate, in full in substantially equal installments through March 1, 2047 ("Amortization Date"). The result of this calculation will be the new amount of Borrower's monthly payment.

Borrower understands that because Borrower's monthly payments will be calculated over a period of 40 years, but the actual term of Borrower's loan is only 30 years, Borrower's regular monthly payments will be insufficient to pay the entire principal balance of the loan and the interest owed by the Maturity Date and Borrower will be required to pay a single payment (a "Balloon Payment") on the Maturity Date that consists of a regular monthly payment together with the remaining unpaid principal balance of the loan, all accrued and unpaid interest, and all charges due under the Note.

**(D) Limits on Interest Rate Changes**

The interest rate Borrower is required to pay at the first Change Date will not be greater than  9.375 % or less than  7.375 %. Thereafter, Borrower's interest rate will never be increased or decreased on any single Change Date by more than One                       percentage point(s) ( 1.000 %)  from  the  rate of interest Borrower has been paying for the preceding 6       months. Borrower's interest rate will never be greater than              13.375 % or less than                7.375 %.

**(E) Effective Date of Changes**

Borrower's new interest rate will become effective on each Change Date. Borrower will pay the amount of Borrower's new monthly payment beginning on the first monthly payment date after the Change Date until the amount of Borrower's monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to Borrower a notice of any changes in Borrower's interest rate and the amount of Borrower's monthly payment before the effective date of any change. The notice will include information required by law to be given to the Borrower and also the title and telephone number of a person who will answer any question Borrower may have regarding the notice.

**Multistate Fixed/Adjustable Rate Balloon Rider - Libor**

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**
Covenant 18 of the Security Instrument is amended to read as follows:

(A)  Until Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Covenant 18 of the Security Instrument provides as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.**  As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser. If all or any part of the Property or any interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration.  The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument.  If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

(B) When Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Covenant 18 of the Security Instrument shall then instead provide as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser. If all or any part of the Property or any interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

Multistate Fixed/Adjustable Rate Balloon Rider - Libor

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Fixed/Adjustable Rate Balloon Rider.

_____ (Seal)
Kathryn Jean Nusratty                          -Borrower

_____ (Seal)
M. Hasan. Nusratty                             -Borrower

_____ (Seal)
                                               -Borrower

_____ (Seal)
                                               -Borrower

[Sign Original Only]

**Multistate Fixed/Adjustable Rate Balloon Rider - Libor**

**END OF DOCUMENT**

## POLICY OF TITLE INSURANCE ISSUED BY



**stewart**
title guaranty company

SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS CONTAINED IN SCHEDULE B AND THE PROVISIONS OF THE CONDITIONS AND STIPULATIONS HEREOF, STEWART TITLE GUARANTY COMPANY, a Texas corporation, herein called the Company, insures, as of Date of Policy shown in Schedule A, against loss or damage, not exceeding the amount of insurance stated in Schedule A, and costs, attorneys' fees and expenses which the Company may become obligated to pay hereunder, sustained or incurred by the insured by reason of:

1. Title to the estate or interest described in Schedule A being vested otherwise than as stated therein;
2. Any defect in or lien or encumbrance on such title;
3. Lack of a right of access to and from the land; or
4. Unmarketability of such title;
5. The invalidity or unenforceability of the lien of the insured mortgage upon said estate or interest except to the extent that such invalidity or unenforceability, or claim thereof, arises out of the transaction evidenced by the insured mortgage and is based upon
   a. usury, or
   b. any consumer credit protection or truth in lending law;
6. The priority of any lien or encumbrance over the lien of the insured mortgage;
7. Any statutory lien for labor or material which now has gained or hereafter may gain priority over the lien of the insured mortgage, except any such lien arising from an improvement on the land contracted for and commenced subsequent to Date of Policy not financed in whole or in part by proceeds of the indebtedness secured by the insured mortgage which at Date of Policy the insured has advanced or is obligated to advance;
8. Any assessments for street improvements under construction or completed at the date hereof which now have gained or hereafter may gain priority over the insured mortgage; or
9. The invalidity or unenforceability of any assignment, shown in Schedule A, of the insured mortgage or the failure of said assignment to vest title to the insured mortgage in the named insured assignee free and clear of all liens.

IN WITNESS WHEREOF, Stewart Title Guaranty Company has caused this policy to be signed and sealed by its duly authorized officers as of Date of Policy shown in Schedule A.

_Chairman of the Board_

**stewart**
title guaranty company

_President_

_Authorized Countersignature_
PLACER TITLE COMPANY
Agent ID: ▮▮▮▮

ALTA LOAN POLICY - 1970
With Street Improvement Assessment Coverage
STG.AL70

| Policy Serial No. ▮▮▮▮▮▮ |
| --- |

## SCHEDULE A

**Order No.:** ▮▮▮▮▮▮▮

**Policy No.:** ▮▮▮▮▮▮▮▮

**Date of Policy:** February 22, 2007 at 8:00 A.M.

**Amount of Insurance:** $999,999.00

**Premium:** $1,908.20

**Loan No.:** ▮▮▮▮▮▮

1. Name of Insured:

    WASHINGTON MUTUAL BANK, A FEDERAL ASSOCIATION

2. The estate or interest in the land which is encumbered by the insured mortgage is:

    A FEE AS PARCEL 1; AN EASEMENT MORE FULLY DESCRIBED BELOW AS TO PARCEL 2

3. Title to the estate or interest in the land is vested in:

    KATHRYN JEAN NUSRATTY AND M. HASAN NUSRATTY , WIFE AND HUSBAND, AS JOINT TENANTS

4. The insured mortgage and assignments thereof, if any, are described as follows:

    DEED OF TRUST TO SECURE AN INDEBTEDNESS OF $999,999.00 , DATED FEBRUARY 13, 2007, RECORDED FEBRUARY 22, 2007, INSTRUMENT NO. 2007-0052925, OFFICIAL RECORDS.

    TRUSTOR: KATHRYN JEAN NUSRATTY AND M HASAN NUSRATTY, WIFE AND HUSBAND, AS JOINT TENANTS
    TRUSTEE: CALIFORNIA RECONVEYANCE COMPANY, A CALIFORNIA CORPORATION
    BENEFICIARY: WASHINGTON MUTUAL BANK, A FEDERAL ASSOCIATION
    LOAN NO. ▮▮▮▮▮▮

5. The land referred to in this policy is described as follows:

    SEE EXHIBIT "A" ATTACHED FOR LEGAL DESCRIPTION

**PLACER TITLE COMPANY**
**Policy Issuing Agent for Stewart Title Guaranty Company**

ALTA.LENDERS.A



ASSESSOR'S MAP
BOOK 433 PAGE 28
CONTRA COSTA COUNTY, CALIF.
10-27-65                    P.M. 433-11

1" = 100'

Description: Contra Costa,CA Assessor Map 433.28 Page: 1 of 1

Order No.
Policy No.

## EXHIBIT "A" LEGAL DESCRIPTION

THE LAND DESCRIBED HEREIN IS SITUATED IN THE STATE OF CALIFORNIA, COUNTY OF CONTRA COSTA, UNINCORPORATED AREA, AND IS DESCRIBED AS FOLLOWS:

PARCEL ONE:

LOT 6, MAP OF SUBDIVISION 3355, FILED JULY 28, 1965, MAP BOOK 106, PAGE 12, CONTRA COSTA COUNTY RECORDS.

EXCEPTING THEREFROM:

AN EASEMENT, NOT TO BE EXCLUSIVE, AS AN APPURTENANCE TO PARCEL ONE ABOVE WHICH WAS ORIGINALLY CREATED, FOR USE AS A ROADWAY FOR VEHICLES OF ALL KINDS, PEDESTRIANS, AND ANIMALS AND AS A RIGHT OF WAY FOR WATER, GAS, OIL, AND SEWER PIPELINES AND FOR TELEPHONE, ELECTRIC LIGHT AND POWER LINES, TOGETHER WITH THE NECESSARY POLES OR CONDUITS TO CARRY SAID LINES, OVER AND UNDER THE FOLLOWING DESCRIBED PARCEL OF LAND:

BEGINNING ON THE EAST LINE OF LOT 5, DISTANT THEREON NORTH 11 DEGREES 41' 17" WEST 134.49 FEET AND NORTH 1 DEGREE 56' 03" EAST 22.06 FEET FROM THE NORTH LINE OF HEIDE COURT, AS SHOWN ON SAID MAP, (106 M 12); THENCE FROM SAID POINT OF BEGINNING ALONG THE EXTERIOR LINE OF LOTS 5 AND 6 AS FOLLOWS: SOUTH 1 DEGREES 56' 03" WEST 22.06 FEET; SOUTH 11 DEGREES 41' 17" EAST 134.49 FEET; WESTERLY ALONG THE ARC OF A CURVE TO THE LEFT HAVING A RADIUS OF 45 FEET AN ARC DISTANCE OF 20 FEET; AND NORTH 28 DEGREES 49' 43" WEST 135 FEET TO AN ANGLE POINT IN SAID LOT 6; THENCE CONTINUING NORTH 28 DEGREES 49' 43" WEST 68.76 FEET TO A SOUTHWEST LINE OF SAID LOT 5; THENCE SOUTH 60 DEGREES EAST ALONG SAID SOUTHWEST LINE 62.94 FEET TO AN ANGLE POINT THEREIN; THENCE NORTH 69 DEGREES 43' 05" EAST 38.34 FEET TO THE POINT OF BEGINNING.

PARCEL TWO:

RIGHT OF WAY GRANTED IN THE DEED TO MELVIN W. HOLDEN, ET UX, RECORDED JUNE 3, 1970, BOOK 6141, OFFICIAL RECORDS, PAGE 760, AS FOLLOWS:

"AN EASEMENT, NOT TO BE EXCLUSIVE, AS AN APPURTENANCE TO PARCEL ONE ABOVE, FOR USE AS A ROADWAY FOR VEHICLES OF ALL KINDS, PEDESTRIANS, AND ANIMALS AND AS A RIGHT OF WAY FOR WATER, GAS, OIL, AND SEWER PIPELINES AND FOR TELEPHONE, ELECTRIC LIGHT AND POWER LINES, TOGETHER WITH THE NECESSARY POLES OR CONDUITS TO CARRY SAID LINES, OVER AND UNDER THE FOLLOWING DESCRIBE PARCEL OF LAND:

BEGINNING ON THE EAST LINE OF LOT 5, DISTANT THEREON NORTH 11 DEGREES 41' 17" WEST 134.49 FEET AND NORTH 1 DEGREE 56' 03" EAST 22.06 FEET FROM THE NORTH LINE OF HEIDI COURT, AS SHOWN ON SAID MAP, (106 M 12); THENCE FROM SAID POINT OF BEGINNING ALONG THE EXTERIOR LINE OF LOTS 5 AND 6 AS FOLLOWS: SOUTH 1 DEGREES 56' 03" WEST 22.06 FEET; SOUTH 11 DEGREES 41' 17" EAST 134.49 FEET; WESTERLY ALONG THE ARC OF A CURVE TO THE LEFT HAVING A RADIUS OF 45 FEET AN ARC DISTANCE OF 20 FEET; AND NORTH 28 DEGREES 49' 43" WEST 135 FEET TO AN ANGLE POINT IN SAID LOT 6; THENCE CONTINUING NORTH 28 DEGREES 49' 43" WEST 68.76 FEET TO A SOUTHWEST LINE OF SAID LOT 5; THENCE SOUTH 60 DEGREES EAST ALONG SAID SOUTHWEST LINE 62.94 FEET TO AN ANGLE POINT THEREIN; THENCE NORTH 69 DEGREES

LEGAL.POL.LOAN

Order No. ████████
Policy No. ████████

## EXHIBIT "A" LEGAL DESCRIPTION

43' 05 EAST 38.34 FEET TO THE POINT OF  BEGINNING."

A.P.N. ████████

LEGAL.POL.LOAN.O

Order No. ███████

Policy No. ███████

## SCHEDULE B
## PART I

This policy does not insure against loss or damage (and the Company will not pay costs, attorney's fees or expenses) which arise by reason of:

1.  TAXES, SPECIAL AND GENERAL, ASSESSMENT DISTRICTS AND SERVICE AREAS FOR THE FISCAL YEAR 2007-2008, A LIEN, NOT YET DUE OR PAYABLE.

2.  THE LIEN OF SUPPLEMENTAL TAXES, IF ANY, ASSESSED PURSUANT TO THE PROVISIONS OF CHAPTER 3.5, (COMMENCING WITH SECTION 75) OF THE REVENUE AND TAXATION CODE, OF THE STATE OF CALIFORNIA.

3.  AN EASEMENT FOR SEWER AND RIGHTS INCIDENTAL THERETO, AS SHOWN OR AS OFFERED FOR DEDICATION ON THE MAP OF 3355.

    AFFECTS:   A PORTION

4.  TERMS, PROVISIONS, COVENANTS, CONDITIONS, RESTRICTIONS AND EASEMENTS, PROVIDED IN THE COVENANTS, CONDITIONS AND RESTRICTIONS, BUT OMITTING ANY COVENANT, CONDITION OR RESTRICTION, IF ANY, BASED ON RACE, COLOR, RELIGION, SEX, HANDICAP, FAMILIAL STATUS OR NATIONAL ORIGIN UNLESS AND ONLY TO THE EXTENT THAT THE COVENANT, CONDITION OR RESTRICTION (A) IS EXEMPT UNDER TITLE 42 OF THE UNITED STATES CODE, OR (B) RELATES TO HANDICAP, BUT DOES NOT DISCRIMINATE AGAINST HANDICAPPED PERSONS, IN DOCUMENT RECORDED JULY 30, 1965, BOOK 4921, PAGE 92, OFFICIAL RECORDS.

    NOTE:    SECTION 12956.1 OF THE GOVERNMENT CODE PROVIDES THE FOLLOWING: "IF THIS DOCUMENT CONTAINS ANY RESTRICTION BASED ON RACE, COLOR, RELIGION, SEX, SEXUAL ORIENTATION, FAMILIAL STATUS, MARITAL STATUS, DISABILITY, NATIONAL ORIGIN, SOURCE OF INCOME AS DEFINED IN SUBDIVISION (P) OF SECTION 12955, OR ANCESTRY, THAT RESTRICTION VIOLATES STATE AND FEDERAL FAIR HOUSING LAWS AND IS VOID, AND MAY BE REMOVED PURSUANT TO SECTION 12956.2 OF THE GOVERNMENT CODE. LAWFUL RESTRICTIONS UNDER STATE AND FEDERAL LAW ON THE AGE OF OCCUPANTS IN SENIOR HOUSING OR HOUSING FOR OLDER PERSONS SHALL NOT BE CONSTRUED AS RESTRICTIONS BASED ON FAMILIAL STATUS."

    CONTAINS MORTGAGEE PROTECTION CLAUSE.

    CONTAINS NO REVERSIONARY CLAUSE.

5.  AN EASEMENT FOR USE AS A ROADWAY FOR VEHICLES OF ALL KINDS, PEDESTRIANS, AND ANIMALS AND AS A RIGHT OF WAY FOR WATER, GAS, OIL AND SEWER PIPELINES AND FOR TELEPHONE, ELECTRIC LIGHT AND POWER LINES, TOGETHER WITH THE NECESSARY POLES OR CONDUITS TO CARRY SAID LINES AND RIGHTS INCIDENTAL THERETO AS RESERVED IN A DOCUMENT, RECORDED JUNE 03, 1970, BOOK 6141, PAGE 760, OFFICIAL RECORDS.

    AFFECTS:   PORTION OF PARCEL ONE ABOVE LYING WITHIN PARCEL TWO

**PLACER TITLE COMPANY**
**Policy Issuing Agent for Stewart Title Guaranty Company**

ALTA.LENDERS.BX

Order No. ▇▇▇▇▇▇
Policy No. ▇▇▇▇▇▇

### SCHEDULE B
### PART I (Continued)

6.  DECLARATION OF HOMESTEAD DATED SEPTEMBER 29, 2003, EXECUTED BY M. HASAN
    NUSRATTY, RECORDED SEPTEMBER 29, 2003, INSTRUMENT NO. 2003-0486904,
    OFFICIAL RECORDS.

    SAID MATTER AFFECTS THIS AND OTHER PROPERTY.

Order No. ████████
Policy No. ████████

## SCHEDULE B
## PART II

In addition to the matters set forth in Part I of this Schedule, the title to the estate or interest in the land described or referred to in Schedule A is subject to the following matters, if any be shown, but the Company insures that these matters are subordinate to the lien or charge of the insured mortgage upon estate or interest:

DEED OF TRUST TO SECURE AN INDEBTEDNESS OF $250,000.00, DATED MAY 18, 2005, RECORDED JUNE 27, 2005, INSTRUMENT NO. 2005-0233682, OFFICIAL RECORDS.

TRUSTOR:    MOHAMMED HASAN NUSRATTY AND KATHRYN J. NUSRATTY, HUSBAND AND WIFE; DAWOUD E. NASRATY, AN UNMARRIED MAN, ALL AS JOINT TENANTS
TRUSTEE:    CITIBANK SERVICE CORPORATION
BENEFICIARY:    CITIBANK (WEST), FSB
LOAN NO.:    ████████

SAID DEED OF TRUST WAS SUBORDINATED TO THE LIEN OF THE DEED OF TRUST IN PARAGRAPH 4 OF SCHEDULE A, BY INSTRUMENT RECORDED FEBRUARY 22, 2007, INSTRUMENT NO. 2007-0052926, OFFICIAL RECORDS.

## PLACER TITLE COMPANY
### Policy Issuing Agent for Stewart Title Guaranty Company

Order No.

ALTA ENDORSEMENT 8.1
Policy No.
CLTA ENDORSEMENT 110.9
Loan No.
Fee: $25.00

*The insurance afforded by this endorsement is only effective if the land is used or is to be used primarily for residential purposes.*

*The company insures the Insured against loss or damage sustained by reason of lack of priority of the lien of the Insured mortgage over:*

*(a) any environmental protection lien which, at Date of Policy is recorded in those records established under state statutes at Date of Policy for the purpose of imparting constructive notice of matters relating to real property to purchasers for value and without knowledge, or filed in the records of the clerk of the United States district court for the district in which the land is located, except as set forth in Schedule B; or*

*(b) any environmental protection lien provided for by any state statute in effect at Date of Policy, except environmental protection liens provided for by the following state statutes: None*

*This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.*

*Dated:  February 22, 2007 at 8:00 A.M.*

CLTA Endorsement Form 110.9
ALTA Endorsement Form 8.1
Environmental Protection Lien

8.1

## PLACER TITLE COMPANY
### Policy Issuing Agent for Stewart Title Guaranty Company

*Order No.*        CLTA Endorsement Form 100
*Policy No.*                           Fee              $0.00
*Loan No.*

The Company hereby insures the owner of the indebtedness secured by the insured mortgage against loss or damage which the insured shall sustain by reason of:

1. The existence of any of the following:
   (a) Covenants, conditions or restrictions under which the lien of the mortgage referred to in Schedule A can be cut off, subordinated, or otherwise impaired;
   (b) Present violations on the land of any enforceable covenants, conditions or restrictions;
   (c) Except as shown in Schedule B, encroachments of buildings, structures or improvements located on the land onto adjoining lands, or any encroachments onto the land of buildings, structures or improvements located on adjoining lands.

2. (a) Any future violations on the land of any covenants, conditions or restrictions occurring prior to acquisition of title to the estate or interest referred to in Schedule A by the insured, provided such violations result in impairment or loss of the lien of the mortgage referred to in Schedule A, or result in impairment or loss of the title to the estate or interest referred to in Schedule A if the insured shall acquire such title in satisfaction of the indebtedness secured by the insured mortgage;
   (b) Unmarketability of the title to the estate or interest referred to in Schedule A by reason of any violations on the land, occurring prior to acquisition of title to the estate or interest referred to in Schedule A by the insured, of any covenants, conditions or restrictions.

3. Damage to existing improvements, including lawns, shrubbery or trees:
   (a) Which are located or encroach upon that portion of the land subject to any easement shown in Schedule B, which damage results from the exercise of the right to use or maintain such easement for the purposes for which the same was granted or reserved;
   (b) Resulting from the exercise of any right to use the surface of the land for the extraction or development of the minerals excepted from the description of the land or shown as a reservation in Schedule B.

4. Any final court order or judgment requiring removal from any land adjoining the land of any encroachment shown in Schedule B.

As used in this endorsement, the words "covenants, conditions or restrictions" do not refer to or include the terms, covenants, conditions or restrictions contained in any lease.

As used in this endorsement, the words "covenants, conditions or restrictions" do not refer to or include any covenant, condition or restriction (a) relating to obligations of any type to perform maintenance, repair or remediation on the land, or (b) pertaining to environmental protection of any kind or nature, including hazardous or toxic matters, conditions or substances except to the extent that a notice of a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy and is not excepted in Schedule B.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

Dated:  February 22, 2007 at 8:00 A.M.

**PLACER TITLE COMPANY**
Policy Issuing Agent for Stewart Title Guaranty Company

Order No.
Policy No.
Loan No.

CLTA Endorsement Form 116
Fee: $0.00

The Company hereby insures the owner of the indebtedness secured by the insured mortgage against loss or damage which the insured shall sustain by reason of the failure of (i)

A RESIDENCE

known as

2531 HEIDE COURT, EL SOBRANTE, CALIFORNIA

to be located on the land at Date of Policy, or (ii) the map attached to this policy to correctly show the location and dimensions of the land according to the public records.

This endorsement is made a part of the policy and is subject to all of the terms and provisions thereof and of any prior endorsements thereto.  Except to the extent expressly stated, it neither modifies any of the terms and provisions of the policy and any prior endorsements, nor does it extend the effective date of the policy and any prior endorsements, nor does it increase the face amount thereof.

Dated:  February 22, 2007 at 8:00 A.M.

116

**PLACER TITLE COMPANY**
Policy Issuing Agent for Stewart Title Guaranty Company

Order No.
Policy No.
Loan #

ENDORSEMENT 111.9
Fee $ 0.00

The Company insures the Insured mortgagee against loss or damage by reason of:

(1)  The invalidity or unenforceability of the lien of the insured mortgage
resulting from the provisions therein which provide for a Conditional
Right to Refinance and a change in the rate of interest as set forth
in the Mortgage Rider.

(2)  Loss of priority of the lien of the insured mortgage as security for the
unpaid principal balance of the loan, together with interest thereon, which
loss of priority is caused by the exercise of the Conditional Right to
Refinance and the extension of the loan term to the New Maturity Date
set forth on the Rider and a change in the rate of interest, provided
that all the conditions set forth in paragraphs 2 and 5 of the Balloon
Mortgage Rider have been met, and there are no other liens, defects,
encumbrances, or other adverse matters affecting title arising subsequent
to Date of Policy.

This endorsement does not insure against loss or damage based upon (a) usury or
(b) any consumer credit protection or truth in lending law or (c) bankruptcy.

This endorsement is made a part of the policy and is subject to all of the
terms and provisions thereof and of any prior endorsements thereto.  Except to the
extent expressly stated, it neither modifies any of the terms and provisions of the
policy and any prior endorsements, nor does it extend the effective date of the
policy and any prior endorsements, nor does it increase the face amount thereof.

Dated:  February 22, 2007 at 8:00 A.M.

111.9

## EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy:

1. Any law, ordinance or governmental regulation (including but not limited to building and zoning ordinances) restricting or regulating or prohibiting the occupancy, use or enjoyment of the land, or regulating the character, dimensions or location of any improvement now or hereafter erected on the land, or prohibiting a separation in ownership or a reduction in the dimensions or area of the land, or the effect of any violation of any such law, ordinance or governmental regulation.
2. Rights of eminent domain or governmental rights of police power unless notice of the exercise of such rights appears in the public records at Date of Policy.
3. Defects, liens, encumbrances, adverse claims, or other matters (a) created, suffered, assumed or agreed to by the insured claimant; (b) not known to the Company and not shown by the public records but known to the insured claimant either at Date of Policy or at the date such claimant acquired an estate or interest insured by this policy or acquired the insured mortgage and not disclosed in writing by the insured claimant to the Company prior to the date such insured claimant became an insured hereunder; (c) resulting in no loss or damage to the insured claimant; (d) attaching or created subsequent to Date of Policy (except to the extent insurance is afforded herein as to any statutory lien for labor or material or to the extent insurance is afforded herein as to assessments for street improvements under construction or completed at Date of Policy).
4. Unenforceability of the lien of the insured mortgage because of failure of the insured at Date of Policy or of any subsequent owner of the indebtedness to comply with applicable "doing business" laws of the state in which the land is situated.

## CONDITIONS AND STIPULATIONS

1. **Definition of Terms**
   The following terms when used in this policy mean:
   (a) "insured": the insured named in Schedule A. The term "insured" also includes (i) the owner of the indebtedness secured by the insured mortgage and each successor in ownership of such indebtedness (reserving, however, all rights and defenses as to any such successor who acquires the indebtedness by operation of law as distinguished from purchase including, but not limited to, heirs, distributees, devisees, survivors, personal representatives, next of kin or corporate or fiduciary successors that the Company would have had against the successor's transferor), and further includes (ii) any governmental agency or instrumentality which is an insurer or guarantor under an insurance contractor guaranty insuring or guaranteeing said indebtedness, or any part thereof, whether named as an insured herein or not, and (iii) the parties designated in paragraph 2(a) of these Conditions and Stipulations.
   (b) "insured claimant": an insured claiming loss or damage hereunder.
   (c) "knowledge": actual knowledge, not constructive knowledge or notice which may be imputed to an insured by reason of any public records.
   (d) "land": the land described, specifically or by reference in Schedule A, and improvements affixed thereto which by law constitute real property; provided, however, the term "land" does not include any property beyond the lines of the area specifically described or referred to in Schedule A, nor any right, title, interest, estate or easement in abutting streets, roads, avenues, alleys, lanes, ways or waterways, but nothing herein shall modify or limit the extent to which a right of access to and from the land is insured by this policy.
   (e) "mortgage": mortgage, deed of trust, trust deed, or other security instrument.
   (f) "public records": those records which by law impart constructive notice of matters relating to said land.

2. (a) **Condition of Insurance After Acquisition of Title**
   This policy shall continue in force as of Date of Policy in favor of an insured who acquires all or any part of the estate or interest in the land described in Schedule A by foreclosure, trustee's sale, conveyance in lieu of foreclosure, or other legal manner which discharges the lien of the insured mortgage, and if the insured is a corporation, its transferee of the estate or interest so acquired, provided the transferee is the parent or wholly owned subsidiary of the insured; and in favor of any governmental agency or instrumentality which acquires all or any part of the estate or interest pursuant to a contract of insurance or guaranty insuring or guaranteeing the indebtedness secured by the insured mortgage; provided that the amount of insurance hereunder after such acquisition, exclusive of costs, attorneys' fees and expenses which the Company may become obligated to pay, shall not exceed the least of:
      (i) the amount of insurance stated in Schedule A;
      (ii) the amount of the unpaid principal of the indebtedness as defined in paragraph 8 hereof, plus interest thereon, expenses of foreclosure and amounts advanced to protect the lien of the insured mortgage and secured by said insured mortgage at the time of acquisition of such estate or interest in the land; or
      (iii) the amount paid by any governmental agency or instrumentality, if such agency or instrumentality is the insured claimant, in the acquisition of such estate or interest in satisfaction of its insurance contract or guaranty.

   (b) **Continuation of Insurance after Conveyance of Title**
   The coverage of this policy shall continue in force as of Date of Policy in favor of an insured so long as such insured retains an estate or interest in the land, or holds an indebtedness secured by a purchase money mortgage given by a purchaser from such insured, or so long as such insured shall have liability by reason of covenants of warranty made by such insured in any transfer or conveyance of such estate or interest; provided, however, this policy shall not continue in force in favor of any purchaser from such insured of either said estate or interest or the indebtedness secured by a purchase money mortgage given to such insured.

3. **Defense and Prosecution of Actions - Notice of Claim to be Given by an Insured Claimant**
   (a) The Company, at its own cost and without undue delay, shall provide for the defense of an insured in all litigation consisting of actions or proceedings commenced against such insured, or defenses, restraining orders or injunctions interposed against a foreclosure of the insured mortgage or a defense interposed against an insured in an action to enforce a contract for a sale of the indebtedness secured by the insured mortgage, or a sale of the estate or interest in said land, to the extent that such litigation is founded upon an alleged defect, lien, encumbrance, or other matter insured against by this policy.
   (b) The insured shall notify the Company promptly in writing (i) in case any action or proceeding is begun or defense or restraining order or injunction is interposed as set forth in (a) above, (ii) in case knowledge shall come to an insured hereunder of any claim of title or interest which is adverse to the title to the estate or interest or the lien of the insured mortgage, as insured, and which might cause loss or damage for which the Company may be liable by virtue of this policy; or (iii) if title to the estate or interest or the lien of the insured mortgage, as insured, is rejected as unmarketable. If such prompt notice shall not be given to the Company, then as to such insured all liability of the Company shall cease and terminate in regard to the matter or matters for which such prompt notice is required; provided, however, that failure to notify shall in no case prejudice the rights of any such insured under this policy unless the Company shall be prejudiced by such failure and then only to the extent of such prejudice.
   (c) The Company shall have the right at its own cost to institute and without undue delay prosecute any action or proceeding or to do any other act which in its opinion may be necessary or desirable to establish the title to the estate or interest or the lien of the insured mortgage, as insured, and the Company may take any appropriate action under the terms of this policy, whether or not it shall be liable thereunder, and shall not thereby concede liability or waive any provision of this policy.
   (d) Whenever the Company shall have brought any action or interposed a defense as required or permitted by the provisions of this policy, the Company may pursue any such litigation to final determination by a court of competent jurisdiction and expressly reserves the right, in its sole discretion, to appeal from any adverse judgment order.
   (e) In all cases where this policy permits or requires the Company to prosecute or provide for the defense of any action or proceeding, the insured hereunder shall secure to the Company the right to so prosecute or provide defense in such action or proceeding, and all appeals therein, and permit the Company to use, at its option, the name of such insured for such purpose. Whenever requested by the Company, such insured shall give the Company all reasonable aid in any such action or proceeding, in effecting settlement, securing evidence, obtaining witnesses, or prosecuting or defending such action or proceeding, and the Company shall reimburse such insured for any expense so incurred.

CA.AL70.2

## CONDITIONS AND STIPULATIONS (Continued)

**4. Notice of Loss - Limitation of Action**

In addition to the notices required under paragraph 3(b) of these Conditions and Stipulations, a statement in writing of any loss or damage for which it is claimed the Company is liable under this policy shall be furnished to the Company within 90 days after such loss or damage shall have been determined and no right of action shall accrue to an insured claimant until 30 days after such statement shall have been furnished. Failure to furnish such statement of loss or damage shall terminate any liability of the Company under this policy as to such loss or damage.

**5. Options to Pay or Otherwise Settle Claims**

The Company shall have the option to pay or otherwise settle for or in the name of an insured claimant any claim insured against or to terminate all liability and obligations of the Company hereunder by paying or tendering payment of the amount of insurance under this policy together with any costs, attorneys' fees and expenses incurred up to the time of such payment or tender of payment by the insured claimant and authorized by the Company. In case loss or damage is claimed under this policy by an insured, the Company shall have the further option to purchase such indebtedness for the amount owing thereon together with all costs, attorneys' fees and expenses which the Company is obligated hereunder to pay. If the Company offers to purchase said indebtedness as herein provided, the owner of such indebtedness shall transfer and assign said indebtedness and the mortgage and any collateral securing the same to the Company upon payment therefor as herein provided.

**6. Determination and Payment of Loss**

(a) The liability of the Company under this policy shall in no case exceed the lest of:

(i) the actual loss of the insured claimant; or

(ii) the amount of insurance stated in Schedule A, or, if applicable, the amount of insurance as defined in paragraph 2(a) hereof; or

(iii) the amount of the indebtedness secured by the insured mortgage as determined under paragraph 8 hereof, at the time the loss or damage insured against hereunder occurs, together with interest thereon; or

(b) The Company will pay, in addition to any loss insured against by this policy, all costs imposed upon an insured in litigation carried on by the Company for such insured, and all costs, attorneys' fees and expenses in litigation carried on by such insured with the written authorization of the Company.

(c) When liability has been definitely fixed in accordance with the conditions of this policy, the loss or damage shall be payable within 30 days thereafter.

**7. Limitation of Liability**

No claim shall arise or be maintainable under this policy (a) if the Company, after having received notice of an alleged defect, lien or encumbrance insured against hereunder, by litigation or otherwise, removes such defect, lien or encumbrance or establishes the title, or the lien of the insured mortgage, as insured, within a reasonable time after receipt of such notice; (b) in the event of litigation until there has been a final determination by a court of competent jurisdiction, and disposition of all appeals therefrom, adverse to the title or to the lien of the insured mortgage, as insured, as provided in paragraph 3 hereof; or (c) for liability voluntarily assumed by an insured in settling any claim or suit without prior written consent of the Company.

**8. Reduction of Liability**

(a) All payments under this policy, except payment made for costs, attorneys' fees and expenses, shall reduce the amount of the insurance pro tanto; provided, however, such payments, prior to the acquisition of title to said estate or interest as provided in paragraph 2(a) of these Conditions and Stipulations, shall not reduce pro tanto the amount of the insurance afforded hereunder except to the extent that such payments reduce the amount of the indebtedness secured by the insured mortgage.

Payment in full by any person or voluntary satisfaction or release of the insured mortgage shall terminate all liability of the Company except as provided in paragraph 2(a) hereof.

(b) The liability of the Company shall not be increased by additional principal indebtedness created subsequent to Date of Policy, except as to amounts advanced to protect the lien of the insured mortgage and secured thereby.

No payment shall be made without producing this policy for endorsement of such payment unless the policy be lost or destroyed, in which case proof of such loss or destruction shall be furnished to the satisfaction of the Company.

**9. Liability Noncumulative**

If the insured acquires title to the estate or interest in satisfaction of the indebtedness secured by the insured mortgage, or any part thereof, it is expressly understood that the amount of insurance under this policy shall be reduced by any amount the Company may pay under any policy insuring a mortgage hereafter executed by an insured which is a charge or lien on the estate or interest described or referred to in Schedule A, and the amount so paid shall be deemed a payment under this policy.

**10. Subrogation upon Payment or Settlement**

Whenever the Company shall have settled a claim under this policy, all right of subrogation shall vest in the Company unaffected by any act of the insured claimant, except that the owner of the indebtedness secured by the insured mortgage may release or substitute the personal liability of any debtor or guarantor, or extend or otherwise modify the terms of payment, or release a portion of the estate or interest from the lien of the insured mortgage, or release any collateral security for the indebtedness, provided such act occurs prior to receipt by the insured of notice of any claim of title or interest adverse to the title to the estate or interest or the priority of the lien of the insured mortgage and does not result in any loss of priority of the lien of the insured mortgage. The Company shall be subrogated to and be entitled to all rights and remedies which such insured claimant would have had against any person or property in respect to such claim had this policy not been issued, and if requested by the Company, such insured claimant shall transfer to the Company all rights and remedies against any person or property necessary in order to perfect such right of subrogation and shall permit the Company to use the name of such insured claimant in any transaction or litigation involving such rights or remedies. If the payment does not cover the loss of such insured claimant, the Company shall be subrogated to such rights and remedies in the proportion which said payment bears to the amount of said loss, but such subrogation shall be in subordination to the insured mortgage. If loss of priority should result from any act of such insured claimant, such act shall not void this policy, but the Company, in that event, shall be required to pay only that part of any losses insured against hereunder which shall exceed the amount, if any, lost to the Company by reason of the impairment of the right of subrogation.

**11. Liability Limited to this Policy**

This instrument together with all endorsements and other instruments, if any, attached hereto by the Company is the entire policy and contract between the insured and the Company.

Any claim of loss or damage, whether or not based on negligence, and which arises out of the status of the lien of the insured mortgage or of the title to the estate or interest covered hereby or any action asserting such claim, shall be restricted to the provisions and conditions and stipulations of this policy.

No amendment of or endorsement to this policy can be made except by writing endorsed hereon or attached hereto signed by either the President, a Vice President, the Secretary, an Assistant Secretary, or validating officer or authorized signatory of the Company.

**12. Notices, Where Sent**

All notices required to be given the Company and any statement in writing required to be furnished the Company shall be addressed to it at P.O. Box 2029, Houston, Texas 77252, and identify this policy by its printed POLICY SERIAL NUMBER which appears on the bottom of the front of the first page of this policy. The use of AIR MAIL for these notices and statements will expedite and aid proper handling of claims hereunder.

**13.** The amount specified in Schedule A is the entire charge for acceptance of risk. It includes charges for title search, examination and gross premium for title insurance if same is customary or required to be shown in the state in which the policy is issued.

CA-AL70-3

Loan Number

# LOAN MODIFICATION AGREEMENT

Borrower ("I")[1]:  **KATHRYN J NUSRATTY and M H NUSRATTY**
Lender ("Lender"):   **JPMORGAN CHASE BANK, N.A.**
Date of First Lien Security Instrument (the "Mortgage") and Note (the "Note"):  **FEBRUARY 13, 2007**
Loan Number: ▮▮▮▮▮▮ (the "Loan")
Property Address:  **2531 HEIDE CT, EL SOBRANTE, CALIFORNIA 94803**   (the "Property")

If my representations in Section 1 continue to be true in all material respects, then the provisions of Section 2 of this Loan Modification Agreement ("Agreement") will, as set forth in Section 2, amend and supplement (i) the Mortgage on the Property, and (ii) the Note secured by the Mortgage. The Mortgage and Note together, as may previously have been amended, are referred to as the "Loan Documents."  Capitalized terms used in this Agreement have the meaning given to them in the Loan Documents.

I have provided confirmation of my financial hardship and documents to permit verification of all of my income to determine whether I qualify for the offer described in this Agreement.  This Agreement will not take effect unless and until the Lender signs it.

1.  **My Representations.**  I represent to the Lender and agree:

   A.  I am experiencing a financial hardship, and as a result, am either in default under the Loan Documents or a default is imminent.

   B.  The Property is neither in a state of disrepair, nor condemned.

   C.  There has been no change in the ownership of the Property since I signed the Loan Documents.

   D.  I am not a party to any litigation involving the Loan Documents, except to the extent I may be a defendant in a foreclosure action.

   E.  I have provided documentation for all income that I earn.

   F.  All documents and information I provide pursuant to this Agreement are true and correct.

2.  **The Modification.**  The Loan Documents are hereby modified as of **AUGUST 01, 2011** (the "Modification Effective Date"), and all unpaid late charges are waived.  The Lender agrees to suspend any foreclosure activities so long as I comply with the terms of the Loan Documents, as modified by this Agreement.  The Loan Documents will be modified, and the first modified payment will be due on the date set forth in this Section 2:

   A.  The Maturity Date will be:  **MARCH 01, 2037.**

   B. The modified principal balance of my Note will include all amounts and arrearages that will be past due (excluding unpaid late charges) and may include amounts towards taxes, insurance,

---

[1] If there is more than one Borrower or Mortgagor executing this document, each is referred to as "I".  For purposes of this document words signifying the singular (such as "I") shall include the plural (such as "we") and vice versa where appropriate.

Loan Number [REDACTED]

or other assessments. The new principal balance of my Note is **$1,081,269.94**   (the "New Principal Balance").

C.   **$9,400.00** of the New Principal Balance shall be deferred (the "Deferred Principal Balance"), and I will not pay interest or make monthly payments on this amount. The New Principal Balance less the Deferred Principal Balance shall be referred to as the "Interest Bearing Principal Balance," and this amount is **$1,071,869.94.**  The Interest Bearing Principal Balance will re-amortize over **480** months to a remaining scheduled balance on the Maturity Date of **$593,011.81** (the "Balloon Payment"), which is part of the Interest Bearing Principal Balance. The Balloon Payment will be repaid in accordance with Section 2.D.

Interest will begin to accrue as of **JULY 01, 2011**.  The first New monthly payment on the New Principal Balance will be due on **AUGUST 01, 2011**, and monthly on the same date thereafter.

This Section 2.C does Not apply To the repayment of any Deferred Principal Balance And such a balance will be repaid In accordance With Section 2.D.  My payment schedule For the modified Loan Is As follows:

I promise to pay monthly payments according to the following schedule with respect to the Interest Bearing Principal Balance.

| Years | Interest Rate | Interest Rate Change Date | Monthly Principal & Interest Payment Amount | Payment Begins on | Number of Monthly Payments |
|---|---|---|---|---|---|
| 1-5 | 2.000% | 07/01/2011 | $3,245.90 | 08/01/2011 | 60 |
| 6 | 3.000% | 07/01/2016 | $3,770.98 | 08/01/2016 | 12 |
| 7 | 4.000% | 07/01/2017 | $4,325.23 | 08/01/2017 | 12 |
| 8-26 | 4.500% | 07/01/2018 | $4,610.33 | 08/01/2018 | 224 |

The Lender will notify me of the payment amount prior to the date that the monthly payment on the Interest Bearing Principal Balance will change.

If the Loan Documents currently provide for a balloon, the Balloon Amount resulting from this modification may be different.   The balloon payment of **$583,611.81** will be due on the maturity date unless due earlier in accordance with Section 2.D.

The Deferred Principal Balance of **$9,400.00** will be due on the maturity date unless due earlier in accordance with Section 2.D.

The above terms in this Section 2.C shall supersede any provisions to the contrary in the Loan Documents, including but not limited to provisions for an adjustable or step interest rate.

Loan Number ██████████

D.  I agree to pay in full (i) the Deferred Principal Balance, if any; and (ii) any other amounts still owed under the Loan Documents,  including the Balloon Payment, as identified within this Agreement by the earliest of the date I sell or transfer an interest in the Property, subject to Section 3.E below, the date I pay the entire Interest Bearing Principal Balance, or the Maturity Date.

E.  I will be in default if I do not (i) pay the full amount of a monthly payment on the date it is due, or (ii) comply with the terms of the Loan Documents, as modified by this Agreement.  If a default rate of interest is permitted under the current Loan Documents, then in the event of default, the interest that will be due on the Interest Bearing Principal Balance will be the rate set forth in Section 2.C, and there will be no interest payable on the Deferred Principal Balance, if any.

F.  If I make a partial prepayment of principal, the Lender may apply that partial prepayment first to any remaining Deferred Principal Balance before applying such partial prepayment to other amounts due under this Agreement or the Loan Documents.

3.  **Additional Agreements.**  I agree to the following:

A.  That this Agreement shall supersede the terms of any modification, forbearance, or workout plan, if any, that I previously entered into with the Lender.

B.  To comply, except to the extent that they are modified by this Agreement, with all covenants, agreements, and requirements of the Loan Documents including my agreement to make all payments of taxes, insurance premiums, assessments, impounds, and all other payments, the amount of which may change periodically over the term of my Loan. This Agreement does not waive future escrow requirements. If the Loan includes collection for tax and insurance premiums, this collection will continue for the life of the Loan.

C.  That the Loan Documents are composed of valid, binding agreements, enforceable in accordance with their terms and are hereby reaffirmed.

D.  That all terms and provisions of the Loan Documents, except as expressly modified by this Agreement, remain in full force and effect; nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the obligations contained in the Loan Documents; and that except as otherwise specifically provided in, and as expressly modified by, this Agreement, the Lender and I will be bound by, and will comply with, all of the terms and provisions of the Loan Documents.

E.  That, as of the Modification Effective Date, notwithstanding any other provision of the Loan Documents, I agree as follows:  If all or any part of the Property or any interest in it is sold or transferred without the Lender's prior written consent, the Lender may, at its option, require immediate payment in full of all sums secured by the Mortgage. However, the Lender shall not exercise this option if federal law prohibits the exercise of such option as of the date of such sale or transfer.  If the Lender exercises this option, the Lender shall give me notice of acceleration.  The notice shall provide a period of not less than thirty (30) days from the date the notice is delivered or mailed within which I must pay all sums secured by the Mortgage.  If I fail to pay these sums prior to the expiration of this period, the Lender may invoke any remedies permitted by the Mortgage without further

WF101 V2 2-23-10 LOAN MODIFICATION AGREEMENT - CHAMP ██████████████    Page 3 of 6 pages

Loan Number ▮▮▮▮▮▮

notice or demand on me.

F.  That, as of the Modification Effective Date, a buyer or transferee of the Property will not be permitted, under any circumstance, to assume the Loan.  In any event, this Agreement may not be assigned to, or assumed by, a buyer of the Property.

G.  If any document is lost, misplaced, misstated, or inaccurately reflects the true and correct terms and conditions of the Loan Documents as amended by this Agreement, within ten (10) days after my receipt of the Lender's request, I will execute, acknowledge, initial, and deliver to the Lender any documentation the Lender deems necessary to replace or correct the lost, misplaced, misstated or inaccurate document(s).  If I fail to do so, I will be liable for any and all loss or damage which the Lender reasonably sustains as a result of my failure.

H.  All payment amounts specified in this Agreement assume that payments will be made as scheduled.

I.  If the Borrower(s) received a discharge in a Chapter 7 bankruptcy subsequent to the execution of the Loan Documents, the Lender agrees that such Borrower(s) will not have personal liability on the debt pursuant to this Agreement.

J.  That in agreeing to the changes to the original Loan Documents as reflected in this Agreement, the Lender has relied upon the truth and accuracy of all of the representations made by the Borrower(s), both in this Agreement and in any documentation provided by or on behalf of the Borrower(s) in connection with this Agreement.  If the Lender subsequently determines that such representations or documentation were not truthful or accurate, the Lender may, at its option, rescind this Agreement and reinstate the original terms of the Loan Documents as if this Agreement never occurred.

K.  I acknowledge and agree that if the Lender executing this Agreement is not the current holder or owner of the Note and Mortgage, that such party is the authorized servicing agent for such holder or owner, or its successor in interest, and has full power and authority to bind itself and such holder and owner to the terms of this modification.

**THIS WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

(SIGNATURES CONTINUE ON FOLLOWING PAGES)

Loan Number  ███████

**TO BE SIGNED BY BORROWER ONLY**

BORROWER SIGNATURE PAGE TO MODIFICATION AGREEMENT BETWEEN JPMORGAN CHASE BANK, N.A. AND KATHRYN J NUSRATTY and M H NUSRATTY, LOAN NUMBER ███████ WITH A MODIFICATION EFFECTIVE DATE OF AUGUST 01, 2011

In Witness Whereof the Borrower(s) have executed this agreement.

_Kathy J Nusratty_                                    Date: _6/23/2011_
Borrower -   KATHRYN J NUSRATTY

_deceased - see enclosed Certificate of Death_         Date: ___/___/___
Borrower -   M H NUSRATTY

WF101 V2 2-23-10 LOAN MODIFICATION AGREEMENT - CHAMP  ███████████        Page 5 of 6 pages

Loan Number ███████

## TO BE SIGNED BY LENDER ONLY

**LENDER** SIGNATURE PAGE TO YOUR MODIFICATION AGREEMENT **BETWEEN** JPMORGAN CHASE BANK, N.A. AND KATHRYN J NUSRATTY and M H NUSRATTY, LOAN NUMBER ████████ WITH A MODIFICATION EFFECTIVE DATE OF AUGUST 01, 2011

In Witness Whereof, the Lender has executed this Agreement.

**JPMORGAN CHASE BANK, N.A.**
Lender

By: _____

Date: _____  7·7·11

Kennedy Smith-Fliesher
Vice President

WF101 V2 2-23-10 LOAN MODIFICATION AGREEMENT - CHAMP  ███████████        Page 6 of 6 pages

**LOAN MODIFICATION AGREEMENT**

This Loan Modification Agreement ("Agreement") is effective December 1, 2015, between KATHRYN NUSRATTY and ESTATE OF MOHAMMED NUSRATTY, ("Borrowers") and Select Portfolio Servicing, Inc., acting on behalf of the owner of the Note, ("Lender"). If Borrower's representations and covenants in Section 1 continue to be true in all material respects, then this Agreement will amend and supplement, as set forth in Section 2, the Note made by the Borrower, dated February 13, 2007, in the original principal sum of $999,999.00 ("Note"). The Mortgage or Deed of Trust ("Security Instrument"), which was entered into as security for the Note, encumbers the real and personal property described in the Security Instrument (defined in the Security Instrument as the "Property"), known as:

> 2531 HEIDE CT
> EL SOBRANTE, CA 94803

The Note and Security Instrument are collectively referred to in this Agreement as the "Loan Documents."

1. <u>Borrower Representations and Covenants.</u> Borrower certifies, represents, covenants, and agrees as follows:

   a. Borrower is experiencing a financial hardship, and as a result, (i) is in default under the Note or default is imminent, and (ii) Borrower does not have sufficient income or access to sufficient liquid assets to make the monthly mortgage payments now or in the near future.

   b. There has been no impermissible change in the ownership of the Property since Borrower signed the Note.

   c. If requested by Lender, Borrower has provided documentation for all income that they receive.

   d. All documents and information Borrower has provided to Lender in connection with this Agreement, including the documents and information regarding eligibility for this Agreement, are complete, true and correct.

   e. Borrower has made or will make all payments required under a trial modification plan or loan workout plan, if applicable.

   f. The property is neither in a state of disrepair, nor condemned.

   g. Borrower is not a party to any litigation involving the Loan Documents, except to the extent the borrower may be a defendant in a foreclosure action.

2. <u>The Modification.</u> If Borrower's representations and covenants in Section 1 continue to be true in all material respects and all preconditions to the modification set forth in Section 2 have been met, the Loan Documents will automatically become modified on December 1, 2015 (the "Modification Effective Date") and all late charges that remain unpaid will be waived. Borrower understands that if they fail to make any payments as a precondition to this modification under a workout plan or trial modification plan, this modification will not take effect. The first modified payment will be due on January 1, 2016.

   a. The Maturity Date will be: March 1, 2037.

   b. The modified principal balance of the Note will include all amounts and arrearages that will be past due as of the Modification Effective Date (including unpaid and deferred interest, fees, escrow advances and other costs, but excluding unpaid late charges, collectively, "Unpaid Amounts") less any amounts paid to the Lender but not previously credited to the account associated with the Note. The new principal balance of the Note will be $1,156,191.10 (the "New Principal Balance"). Borrower understands that by agreeing to add the Unpaid Amounts to the outstanding principal balance, the added Unpaid Amounts accrue interest based on the interest rate in effect under this Agreement. Borrower also understands that this means interest will now accrue on the unpaid interest that is added to the outstanding principal balance, which would not happen without this Agreement.

   c. $500,191.10 of the New Principal Balance shall be deferred (the "Deferred Principal Balance") and will be treated as a non-interest bearing principal forbearance. Borrower will not pay interest or make monthly payments on the Deferred Principal Balance. In addition, $213,191.10 of the Deferred Principal Balance is eligible for forgiveness (the "Deferred Principal Reduction Amount"). Provided Borrower is not in default on any new payments such that the equivalent of three full monthly payments are due and unpaid on the last day of any month, on each of the first, second and third anniversaries of September 1, 2015, the Lender shall reduce the Deferred Principal Balance of the Note in installments equal to one-third of the Deferred Principal Reduction Amount. Application of the Deferred Principal Reduction Amount will not result in a new payment schedule. The New Principal Balance less the Deferred Principal Balance shall be referred to as the "Interest Bearing Principal Balance" and this amount is $656,000.00. Interest at the rate of 2.000% will begin to accrue on the Interest Bearing Principal Balance as of December 1, 2015 and the first new monthly payment on the Interest Bearing Principal Balance will be due on January 1, 2016. The payment schedule for the modified Lien Documents is as follows:

| Months | Interest Rate | Interest Rate Change Date | Monthly Principal and Interest Payment Amount | Estimated Monthly Escrow Payment Amount* | Total Monthly Payment* | Payment Begins On | Number of Monthly Payments |
|--------|---------------|---------------------------|----------------------------------------------|------------------------------------------|------------------------|-------------------|----------------------------|
| 1 - 60 | 2.000% | December 1, 2015 | $1,986.54 | $1,057.74, may adjust periodically | $3,044.28, may adjust periodically | January 1, 2016 | 60 |
| 61 - 72 | 3.000% | December 1, 2020 | $2,307.89 | $1,057.74 | $3,365.63 | January 1, 2021 | 12 |
| 73 - 255 | 4.000% | December 1, 2021 | $2,647.10 | $1,057.74 | $3,704.84 | January 1, 2022 | 183 |

**A final balloon payment on the Interest Bearing Principal Balance of $418,542.38 is due on the Maturity Date.**

*The escrow payments may be adjusted periodically in accordance with applicable law and therefore the total monthly payment may change accordingly.

The above terms in this section 2.c shall supersede any provisions to the contrary in the Loan Documents, including but not limited to, provisions for an adjustable, step or simple interest rate. Interest will be charged on unpaid principal until the full amount of Principal has been paid. Borrower will pay interest at a yearly rate of 2.000%.

BALLOON NOTICE. THE AMORTIZATION TERM OF THE LOAN IS 480 MONTHS. AS A RESULT, BORROWER WILL BE REQUIRED TO REPAY THE ENTIRE PRINCIPAL BALANCE AND ANY ACCRUED INTEREST THEN OWING ON THE MATURITY DATE. LENDER HAS NO OBLIGATION TO REFINANCE THIS LOAN, INCLUDING THE DEFERRED PRINCIPAL BALANCE, AT THE END OF TERM. THEREFORE, BORROWER MAY BE REQUIRED TO REPAY THE LOAN OUT OF ASSETS THEY OWN, OR BORROWER MAY HAVE TO FIND ANOTHER LENDER WILLING TO REFINANCE THE LOAN. ASSUMING ANOTHER LENDER REFINANCES THIS LOAN AT MATURITY, BORROWER MAY BE CHARGED INTEREST AT MARKET RATES PREVAILING AT THAT TIME AND SUCH RATES MAY BE HIGHER THAN THE INTEREST RATE PAID ON THE NOTE. BORROWER MAY ALSO HAVE TO PAY SOME OR ALL OF THE CLOSING COSTS NORMALLY ASSOCIATED WITH A NEW MORTGAGE LOAN.

d.  Borrower has agreed to establish an escrow account to pay for property taxes and homeowner's insurance and pay a monthly escrow payment in the initial amount of $1,057.74. Borrower's total monthly payment of principal, interest and escrow will therefore be equal to $3,044.28. Borrower acknowledges that the payments attributable to insurance and taxes are determined by the state taxing authorities and insurance companies and therefore, are subject to change from time to time. Borrower will be notified of any changes.

3.  <u>Other Agreements</u>. Borrower and Lender also agree to the following:

a.  This Agreement shall supersede any modification, forbearance, trial period plan, or other workout plan that Borrower previously entered into with Lender.

b.  The Security Instrument and Note, as modified by this Agreement, are duly valid, binding agreements, enforceable in accordance with their terms and are hereby reaffirmed.

c.  All terms of the Security Instrument and Note, except as expressly modified by this Agreement, or by the U.S. Bankruptcy Code, remain in full force and effect. Nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the obligations contained in the Note and Security Instrument.

d.  Borrower will be bound by and comply with all covenants, agreements, and requirements of the Note as modified by the Agreement and the Security Instrument, including all requirements to make payments of taxes, insurance premiums, assessments, escrow items, impounds, and all other payments that the Borrower is obligated to make under the Note and Security Instrument.

e. If any document is lost, misplaced, misstated or inaccurately reflects the true and correct terms and conditions of the Loan Documents as amended by this Agreement, within ten (10) days after receipt of the Lender's request, Borrower will execute, acknowledge, initial, and deliver to the Lender any documentation the Lender deems necessary to replace or correct the lost, misplaced, misstated or inaccurate document(s). If Borrower fails to do so, Borrower will be liable for any and all loss or damage which the Lender reasonably sustains as a result of Borrower's failure. At Lender's option, this Agreement will be void and of no legal effect upon notice of such loss, misplacement, misstatement, or inaccuracy. If Borrower elects not to sign any such corrective documentation, the terms of the original Loan Documents shall continue in full force and effect, such terms will not be modified by this Agreement, and Borrower will not be eligible for a modification.

f. The mortgage insurance premiums due from Borrower, if applicable, may increase as a result of the capitalization, which will result in a higher total monthly payment. Furthermore, the date on which Borrower may request cancellation of mortgage insurance may change as a result of the New Principal Balance.

g. As of the Modification Effective Date, notwithstanding any other provision of the Loan Documents, Borrower agrees as follows: If all or any part of the Property or any interest in it is sold or transferred without the Lender's prior written consent, the Lender may, at its option, require immediate payment in full of all sums secured by the Mortgage. However, the Lender shall not exercise this option if federal law prohibits the exercise of such option as of the date of such sale or transfer. If the Lender exercises this option, the lender shall give borrower notice of acceleration. The notice shall provide a period of not less than thirty (30) days – depending on state law and other requirements – from the date the notice is delivered or mailed within which Borrower must pay all sums secured by the Mortgage. If Borrower fails to pay these sums prior to the expiration of this period, the Lender may invoke any remedies permitted by the Mortgage without further notice or demand on the Borrower.

h. As of the Modification Effective Date, a buyer of the Property will not be permitted, under any circumstance, to assume the Loan. In any event, this Agreement may not be assigned to, or assumed by, a buyer of the Property.

i. All payment amounts specified in this Agreement assume that payments will be made as scheduled.

j. If Borrower is in bankruptcy upon execution of this document, Borrower will cooperate fully with Lender in obtaining any required bankruptcy court and trustee approvals in accordance with local court rules and procedures. Borrower understands that if such approvals are not received, then the terms of this Agreement will be null and void. If this Agreement becomes null and void, the terms of the original Loan Documents shall continue in full force and effect, and such terms shall not be modified by this Agreement.

k. If Borrower(s) received a discharge in a Chapter 7 bankruptcy subsequent to the execution of the Loan Documents, Lender agrees that such Borrower(s) will not have personal liability on the debt pursuant to this Agreement.

l. In agreeing to the changes to the original Loan Documents as reflected in this Agreement, Lender has relied upon the truth and accuracy of all of the representations made by Borrower(s), both in this Agreement and in any documentation provided by or on behalf of Borrower(s) in connection with this Agreement. If Lender subsequently determines that such representations or documentation were not truthful or accurate, Lender may, at its option, rescind this Agreement and reinstate the original terms of the Loan Documents as if this Agreement never occurred.

The Borrower(s) and Lender have signed this Agreement as of the Effective Date.

_____
Borrower Signature:

Date: 12-8-2015

_____
Borrower Signature:

Date: _____

Select Portfolio Servicing, Inc. (On behalf of Lender)

Date: DEC 1 8 2015

Heather Perkins-Canas
Document Control Officer

DIGIMAIL
DEC 0 9 2015

[RECORDING REQUESTED BY]
NATIONWIDE TITLE CLEARING
[AND WHEN RECORDED MAIL TO]
JPMorgan Chase Bank, NA
C/O NTC 2100 Alt. 19 North
Palm Harbor, FL 34683

Loan #: ██████████



CONTRA COSTA Co Recorder Office
STEPHEN L. WEIR, Clerk-Recorder
DOC- 2013-0020075-00
Check Number
Thursday, JAN 24, 2013 10:27:15
MOD   $1.00 REC   $11.00 FTC   $0.00
DAF   $2.70 REF   $0.30 RED   $1.00
ERD   $1.00
Ttl Pd   $17.00    Rcpt # ██████
CLM/RV/1-1

## CORPORATE ASSIGNMENT OF DEED OF TRUST

Contact JPMORGAN CHASE BANK, N.A. for this instrument 780 Kansas Lane, Suite A, Monroe, LA 71203, telephone # ██████ which is responsible for receiving payments.

FOR GOOD AND VALUABLE CONSIDERATION, the sufficiency of which is hereby acknowledged, the undersigned, FEDERAL DEPOSIT INSURANCE CORPORATION, AS RECEIVER OF WASHINGTON MUTUAL BANK, WHOSE ADDRESS IS 700 Kansas Lane, MC 8000, MONROE, LA, 71203, (ASSIGNOR), by these presents does convey, grant, assign, transfer and set over the described Deed of Trust without recourse, representation or warranty, together with all right, title and interest secured thereby, all liens, and any rights due or to become due thereon to CITIBANK, N.A., AS TRUSTEE FOR WAMU SERIES 2007-HE3 TRUST, WHOSE ADDRESS IS 700 KANSAS LANE, MC 8000, MONROE, LA 71203 ██████ ITS SUCCESSORS OR ASSIGNS, (ASSIGNEE).

Said Deed of Trust made by KATHRYN JEAN NUSRATTY AND M. HASAN NUSRATTY and recorded on 02/22/2007 as Instrument # 2007-0052925-00 in Book , Page in the office of the CONTRA COSTA County Recorder, California.

Property more commonly known as: 2531 HEIDE COURT, EL SOBRANTE, CA 94803

This Assignment is made without recourse, representation or warranty, express or implied, by the FDIC in its corporate capacity or as Receiver.

IN WITNESS WHEREOF, this Assignment is executed on 01 / 11 /2013 (MM/DD/YYYY)
FEDERAL DEPOSIT INSURANCE CORPORATION, AS RECEIVER OF WASHINGTON MUTUAL BANK, by JPMORGAN CHASE BANK, NATIONAL ASSOCIATION, its Attorney-in-Fact    POA RECORDED: 11/15/2012
DOC#: 2012-0290299-00

By: _Latoya M Jackson_
    Latoya M Jackson
VICE PRESIDENT

## ACKNOWLEDGEMENT

STATE OF LOUISIANA
PARISH OF OUACHITA
On 01 / 11 /2013 (MM/DD/YYYY), before me appeared _Latoya M Jackson_ ., to me personally known, who did say that he/she/they is/are the VICE PRESIDENT of JPMORGAN CHASE BANK, NATIONAL ASSOCIATION as Attorney-in-Fact for FEDERAL DEPOSIT INSURANCE CORPORATION, AS RECEIVER OF WASHINGTON MUTUAL BANK and that the instrument was signed on behalf of the corporation (or association), by authority from its board of directors, and that he/she/they acknowledged the instrument to be the free act and deed of the corporation (or association).

_Helen P Tubbs_
Helen P Tubbs
Notary Public - State of LOUISIANA
Commission expires: Upon My Death

Document Prepared By: E.Lance/NTC, 2100 Alt. 19 North, Palm Harbor, FL 34683 ██████

[C] FRMCA1_JPCAS2

Electronically Recorded
CONTRA COSTA Co Recorder Office
KRISTIN B. CONNELLY, Clerk-Recorder

**DOC - 2024-0048207**
Wednesday, May 22, 2024 15:25:00

Recording Requested By:
Residential RealEstate Review

SB2 Fee: $75.00

When Recorded Return To:

Residential RealEstate Review
Collateral Document Services
3217 S. Decker Lake Drive
Salt Lake City, UT 84119

Total Paid: $92.00          Receipt #:

10 - SimpliFile

## CORPORATE ASSIGNMENT OF DEED OF TRUST

Contra Costa, California
Residential RealEstate Review#:
Aliyah Kelsall

Prepared By: _____, Select Portfolio Servicing, Inc. 3217 S. Decker Lake Drive  Salt Lake City, UT, 84119

For Value Received, CITIBANK, N.A., AS TRUSTEE FOR WAMU SERIES 2007-HE3 TRUST BY SELECT PORTFOLIO SERVICING, INC. ITS ATTORNEY IN FACT at C/O SELECT PORTFOLIO SERVICING, INC, 3217 S. DECKER LAKE DRIVE, SALT LAKE CITY, UT 84119 hereby grants, assigns and transfers to CITIBANK, N.A., AS TRUSTEE, IN TRUST FOR REGISTERED HOLDERS OF WAMU ASSET-BACKED CERTIFICATES WAMU SERIES 2007-HE3 TRUST at C/O SELECT PORTFOLIO SERVICING, INC, 3217 S. DECKER LAKE DRIVE, SALT LAKE CITY, UT 84119 all its interest under that certain Deed of Trust dated 02-13-2007, in the amount of $999,999.00, executed by KATHRYN JEAN NUSRATTY AND M HASAN NUSRATTY, WIFE AND HUSBAND AS JOINT TENANTS to WASHINGTON MUTUAL BANK and Recorded: 02-22-2007 as Instrument No.: 2007-0052925-00, Book/Reel/Liber: N/A, Page/Folio: N/A in the County of Contra Costa, State of California.

Property Address: 2531 HEIDE COURT, EL SOBRANTE, CA 94803

In witness whereof this instrument is executed.

CITIBANK, N.A., AS TRUSTEE FOR WAMU SERIES 2007-HE3 TRUST BY SELECT PORTFOLIO SERVICING, INC. ITS ATTORNEY IN FACT
On ___MAY 17 2024___

_____
Aliyah Kelsall
Document Control Officer

STATE OF Utah
COUNTY OF Salt Lake

On, __MAY 17 2024__, before me, ___Jennifer C. Brown___, a Notary Public in and for SALT LAKE in the State of UTAH, personally appeared ___Aliyah Kelsall___, ___Document Control Officer___, of CITIBANK, N.A., AS TRUSTEE FOR WAMU SERIES 2007-HE3 TRUST BY SELECT PORTFOLIO SERVICING, INC. ITS ATTORNEY IN FACT, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity, and that by his/her/their signature on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal,

_____
Jennifer C. Brown

CASTATE_TRUST_ASSIGN_ASSN



JENNIFER C BROWN
Notary Public  State of Utah
My Commission Expires on:
July 05, 2026
Comm. Number:

# EXHIBIT "B"



**Financial Breakdown Statement**

Data date:04/03/2026 03:53:45PM

Loan Number: ███████

## Financial Breakdown Summary

| Borrower / Loan Information | | | | | | | |
|---|---|---|---|---|---|---|---|
| Loan Number: | ██████ | Loan Status: | BK11 | Interest Type: | VAR | | |
| Borrower: | NUSRATTY, KATHRYN JEAN | Due Date: | 12/01/2022 | Modified Date: | 12/10/2015 | | |
| Co-Borrower: | NUSRATTY, ESTATE OF MOHAMMED H | MI Coverage: | No | Restricted Escrow | $0.00 | | |
| Address: | 2531 HEIDE CT | Acquisition Date: | 05/01/2014 | BK Case #: | 26-10330 | | |
| City: | EL SOBRANTE | Maturity Date: | 03/01/2037 | BK Chapter: | 11 | | |
| State: | CA | Stop Adv date: | MM/DD/YYYY | BK Filing Date: | 02/03/2026 | | |
| County: | Contra Costa | Last Payment Date: | 01/23/2023 | Prepared Date: | 04/03/2026 | | |

| Financial Information | | |
|---|---|---|
| **Unpaid Principal Balance** | | **$1,010,988.44** |
| | Principal Balance | $581,861.04 |
| | Deferred Balance | $429,127.40 |
| **Accrued Interest** | | **$77,621.19** |
| | Interest From Date | 11/01/2022 |
| | Good-thru Date | 04/03/2026 |
| | Interest Rate | 4.00000% |
| | Per Diem Rate | $60.37 |
| **Escrow Advance Balance** | | **$69,672.65** |
| | Taxes | $54,016.46 |
| | Insurance | $15,656.19 |
| | Escrow Refund/Disbursement | $0.00 |
| | Mortgage Insurance | $0.00 |
| **MIP / PMI** | | **$0.00** |
| **Advance Balance** | | **$0.00** |
| | Valuations | $0.00 |
| | Preservation | $0.00 |
| | Inspections | $0.00 |
| | Postage | $0.00 |
| | Misc. | $0.00 |
| **Late Charges** | | **$0.00** |
| **NSF Fees** | | **$310.70** |
| **Fax Fees** | | **$0.00** |
| **Payoff Fees** | | **$0.00** |
| **Interest on Advance** | | **$71.64** |
| **Misc.** | | **$0.00** |
| **Unapplied Funds** | | **$0.00** |
| **Total without Attorney fees** | | **$1,158,664.62** |
| **Advance Balance - Excluded** | | **$3,606.46** |
| | FC Fees | $1,560.00 |
| | FC Costs | $2,046.46 |
| | BK Fees | $0.00 |
| | BK Costs | $0.00 |
| **Total with Attorney fees** | | **$1,162,271.08** |

| Foreclosure Name |
|---|
| Citibank, N.A., as Trustee, in trust for registered Holders of WaMu Asset-Backed Certificates WaMu Series 2007-HE3 Trust |

## Delinquency 1 - Primary Collection (DLQ1/COM2)

```
                         QX   D E L I N Q U E N C Y   OWNR n/a 04/02/26  17:51:53
13-A  ▮▮▮▮▮▮        ARM     PER/CLS/OFF  B/ /SP AGE: 19Y  2M IR:  4.00000 INV: CF3
DUE( 41)    178,973.43  DUE 12/01/22(   )(00/00)  ASSUM:          ACQ:05/01/14
LATE CHRG         .00  PAYMT      @   4,280.00 P: 2531 HEIDE CT
BAD CK FEES    310.70  L/C AMT          119.19     EL SOBRANTE CA 94803
OTHER FEES      71.64  PAYMT + LC     4,399.19 M:
TOT DUE    182,962.23* PRIN BAL   1010,988.44
SUSPENSE         .00  P&I             2,647.10     8215 TERRACE DR
NET DUE    182,962.23  DLQ  0 TIME,PAY 44 DAY     EL CERRITO CA 94530
KATHRYN JEAN NUSRATTY                              ▮▮▮▮▮▮▮▮
ESTATE OF MOHAMMED H NUSRATTY
 *PHONE NO*
-IMD:N------------------- * ADDITIONAL MESSAGES * ----------------WU: P ----
COMBINED 2ND MTG: ORIG AMT = 331920, INT RATE = 0.000%, PRIN BAL = 429127.40
ADD'L 2ND MTG DATA:DEF BAL IND = P,PRIN RD =.00,PRIN FB = 429127.40
-- Short Comments 2 ----------------------------------------------------------
  DATE  USR                    CONTACT RESPONSE REASON RECALL      F/B  REMIND

 031926 EVL <SPOC CALL BACK    THIRD ATTEMPT    VOICE MAIL BOX  >
             <FULL                                              >
 031926 EVL CL M1 CELL    SPOC CLL BCK ATMPT
 031926 EVL CL M1 CELL    NO CONTACT MADE
 031926 EVL <SPOC CALL BACK      SECOND ATTEMPT                 >
```

## Payoff Calculation Totals (PAY4/PG1)

```
          [REDACTED]        AS-OF 04/03/26  PAYOFF CALCULATION TOTALS 04/02/26  17:53:11
NAME KJ NUSRATTY CONTACT NAME KATHRYN JEAN NUSRATTY
------------------------------------------------------------------------------
PRINCIPAL BALANCE        1,010,988.44        ---- 1ST MORTGAGE RATE CHANGES ----
INTEREST 04/03/26           77,621.19        INT FROM      RATE        AMOUNT
PRO RATA MIP/PMI                  .00        11/01/22   4.00000      77,621.19
ESCROW ADVANCE              69,672.65        04/03/26
ESCROW BALANCE                    .00
SUSPENSE BALANCE                  .00
HUD BALANCE                       .00
REPLACEMENT RESERVE               .00
RESTRICTED ESCROW                 .00
TOTAL-FEES                     161.64
ACCUM LATE CHARGES                .00
ACCUM NSF CHARGES              310.70
OTHER FEES DUE                    .00
PENALTY INTEREST                  .00
FLAT/OTHER PENALTY FEE            .00        TOTAL 1ST MTG INTEREST   77,621.19
CR LIFE/ORIG FEE RBATE            .00        TOTAL TO PAYOFF       1,162,361.08
RECOVERABLE BALANCE          3,606.46  NUMBER OF COPIES: 1    PRESS PF1 TO PRINT
                                             TOTAL PAGE 2                    .00

------------------------------------------------------------------------------
```

# Payment Change Maintenance (PCH2/HPMT)

```
                        12/01/22   PAYMENT CHANGE MAINTENANCE   04/02/26 17:52:14
KJ NU[            ]T PMT 04/01/07   INV CF3/001   TYPE CONV. RES.      ARM      MAN B
EH NUSRATTY   CUR PMT 12/01/22   PB     581,861.04      IR  4.00000            GRP 4WE
-- History of Payments ----------------------------------------------------------
```

| PMT DT | 12/01/22 | 07/01/23 | 04/01/24 | 10/01/24 |
|---|---|---|---|---|
| IR | 4.00000 | 4.00000 | 4.00000 | 4.00000 |
| P&I | 2,647.10 | 2,647.10 | 2,647.10 | 2,647.10 |
| COUNTY | 1,223.82 | 1,226.00 | 1,240.89 | 1,240.89 |
| CITY | 0.00 | 0.00 | 0.00 | 0.00 |
| HAZARD | 217.50 | 230.12 | 302.83 | 302.83 |
| MI | 0.00 | 0.00 | 0.00 | 0.00 |
| LIEN | 0.00 | 0.00 | 0.00 | 0.00 |
| OS | 191.58 | 450.81 | 0.00 | 0.00 |
| MISC | 0.00 | 0.00 | 0.00 | 0.00 |
| A&H | 0.00 | 0.00 | 0.00 | 0.00 |
| LIFE | 0.00 | 0.00 | 0.00 | 0.00 |
| REPL | 0.00 | 0.00 | 0.00 | 0.00 |
| HUD | 0.00 | 0.00 | 0.00 | 0.00 |
| 2 P&I | 0.00 | 0.00 | 0.00 | 0.00 |
| NET | 4,280.00 | 4,554.03 | 4,190.82 | 4,190.82 |
| PAYMNT | | | | |
| CHANGE | | | | |
| REASON | | | | |

## Payment Change Maintenance (PCH2/HPMT)

```
              ██████████     12/01/22   PAYMENT CHANGE MAINTENANCE   04/02/26 17:52:14
   KJ NU███████████T PMT 04/01/07   INV CF3/001   TYPE CONV. RES.     ARM      MAN B
   EH NUSRATTY  CUR PMT 12/01/22   PB    581,861.04    IR  4.00000            GRP 4WE
   -- History of Payments ---------------------------------------------------------
   PMT DT   11/01/24         11/01/25         03/01/26         03/01/27
      IR    4.00000          4.00000          4.00000          4.00000
     P&I    2,647.10         2,647.10         2,647.10         2,647.10
  COUNTY    1,266.22         1,266.22         1,296.05         1,296.05
    CITY    0.00             0.00             0.00             0.00
  HAZARD    406.04           406.04           412.18           412.18
      MI    0.00             0.00             0.00             0.00
    LIEN    0.00             0.00             0.00             0.00
      OS    0.00             0.00             435.50           0.00
    MISC    0.00             0.00             0.00             0.00

     A&H    0.00             0.00             0.00             0.00
    LIFE    0.00             0.00             0.00             0.00
    REPL    0.00             0.00             0.00             0.00
     HUD    0.00             0.00             0.00             0.00
   2 P&I    0.00             0.00             0.00             0.00
     NET    4,319.36         4,319.36         4,790.83         4,355.33
  PAYMNT
  CHANGE
  REASON
```

## Payment Change Maintenance (PCH2)

```
                    12/01/22  PAYMENT CHANGE MAINTENANCE  04/02/26 17:52:14
KJ NU███████T PMT 04/01/07  INV CF3/001  TYPE CONV. RES.   ARM      MAN B
EH NUSRATTY  CUR PMT 12/01/22  PB    581,861.04    IR  4.00000         GRP 4WE
-----------*-> REQUEST DATE IS BEYOND ANY FUTURE SCHEDULED CHGS <-*-----------
PMT DT     11/01/25         03/01/26         03/01/27         03/01/37
   IR       4.00000          4.00000          4.00000          UNAV----
  P&I    2,647.10         2,647.10         2,647.10       ----UNAV----
COUNTY   1,266.22         1,296.05         1,296.05         1,296.05
  CITY       0.00             0.00             0.00             0.00
HAZARD     406.04           412.18           412.18           412.18
   MI        0.00             0.00             0.00             0.00
 LIEN        0.00             0.00             0.00             0.00
   OS        0.00           435.50             0.00             0.00
 MISC        0.00             0.00             0.00             0.00

  A&H        0.00             0.00             0.00             0.00
 LIFE        0.00             0.00             0.00             0.00
 REPL        0.00             0.00             0.00             0.00
  HUD        0.00             0.00             0.00             0.00
2 P&I        0.00             0.00             0.00             0.00
  NET    4,319.36         4,790.83         4,355.33
PAYMNT
CHANGE
REASON
```